# Exhibit 1

Version of 12/13/89

LOCAL COOPERATION AGREEMENT
AMONG THE DEPARTMENT OF THE ARMY,
ORANGE COUNTY FLOOD CONTROL DISTRICT,
SAN BERNARDINO COUNTY FLOOD CONTROL DISTRICT AND
RIVERSIDE COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT
FOR CONSTRUCTION OF THE
SANTA ANA RIVER MAINSTEM, INCLUDING SANTIAGO CREEK,
CALIFORNIA FLOOD CONTROL PROJECT

THIS AGREEMENT, entered into this     day of
1989, by and between the DEPARTMENT OF THE ARMY (hereinafter
referred to as the "Government"), acting by and through the
Assistant Secretary of the Army (Civil Works), and the Santa Ana
River Mainstem sponsors, comprised of the Orange County Flood
Control District, the Riverside County Flood Control and Water
Conservation District, and the San Bernardino County Flood Control
District in California (hereinafter referred to as "Orange,"
"Riverside," "San Bernardino" or as "the Sponsors" when considered
collectively),

WITNESSETH, THAT:

WHEREAS, the Santa Ana River Mainstem, including the Santiago
Creek, California project (hereinafter referred to as "the
Project") was authorized by the Water Resources Development Act of
1986, P.L. 99-662 (hereinafter referred to as "the Act")
substantially in accordance with the plans and recommendations of
the Chief of Engineers contained in his reports dated 15 January
1982 and 9 July 1987; and

WHEREAS, construction of recreation features is an authorized
project purpose under the Act and, if implemented, will be the
subject of a separate agreement between the Government and
appropriate non-federal interests other than the Sponsors herein;
and

WHEREAS, water conservation at Prado is the subject of a
separate study and any facilities, quantities of storage, and/or
changes in operation, and the cost sharing for any such items
resulting from that study, if implemented, will be part of a
separate agreement between the Government and non-Federal
interests; and

WHEREAS, Section 103 of the Act specifies the cost-sharing
requirements of non-Federal interests applicable to the Project;
and

WHEREAS, on June 1, 1988, the Assistant Secretary of the Army
(Civil Works) approved a credit with an estimated value of

1

Exhibit 1                                              1-1

$3,315,000 for Orange towards Orange's share of Project cost in accordance with Section 104 of the Act; and

WHEREAS, on 2 October 1989 the Department of the Army entered into an agreement with the Orange County Flood Control District pursuant to Section 215 of 90-483 (42 U.S.C.1962d-5a), as amended, to credit or reimburse the costs of certain work accomplished by local interests which later is incorporated into an authorized project; and

WHEREAS, Section 221 of the Flood Control Act of 1970, Public Law 91-611, as amended, provides that the construction of any water resources project by the Secretary of the Army shall not be commenced until each non-federal interest has entered into a written agreement to furnish its required cooperation for the Project; and

WHEREAS, the Sponsors do not qualify for a reduction of the maximum non-Federal cost share pursuant to the guidelines which implement Section 103(m) of the Act, published in 33 C.F.R., sections 241.1 - 6, entitled "Flood Control Cost-Sharing Requirements Under the Ability to Pay Provision"; and,

WHEREAS, it is to the benefit of the Sponsors and Government to construct this project; and

WHEREAS, the Sponsors have the authority and capability to furnish the cooperation hereinafter set forth and are willing to participate in project cost-sharing and financing, in accordance with the terms of this Agreement;

NOW, THEREFORE, the parties agree as follows:

ARTICLE I - DEFINITIONS

For purposes of This Agreement:

A.   The term "Project" shall mean the Santa Ana River Mainstem project, including Santiago Creek, as described in the Phase II General Design Memorandum and shall include the construction, acquisition, or regulation of the following flood control features: Seven Oaks Dam and Basin; regulation of the 100-year flood plain between Seven Oaks Dam and Prado Basin; modifications to the existing Federal Mill Creek levee project; modifications to Prado Dam and acquisition of additional reservoir lands; construction of the Oak Street Drain from the existing debris basin to Prado reservoir, flood plain acquisition and structural improvements to the Santa Ana River channel between Prado Dam and the Pacific Ocean; Talbert Channel relocation; channelization of the lower reach of Santiago Creek and provision of an upstream detention facility with outlet structure; regulation of the 100-year floodplain between the Santiago Channel and the detention facility, and provision of mitigation and

Exhibit 1                                                              1-2

enhancement lands and improvements, as illustrated in the Phase II General Design Memorandum (GDM). The term "Project" shall not include recreation features and facilities.

B. The term "total project costs" shall mean all costs incurred by the Sponsors and the Government directly related to construction of the Project, excluding any costs for betterments or operation and maintenance. Such costs shall include but not necessarily be limited to, actual construction costs, the value of lands, easements, and rights-of-way, including excavated material disposal areas made available for the Project, relocation and alteration costs, relocations or new construction of railroad bridges and approaches thereto, costs of applicable planning, engineering and design, incurred after October 1, 1985 (including, but not limited to preconstruction engineering and design costs, as defined in C. below), supervision and administration costs, and costs of project construction contract dispute settlements or awards. The term "total project costs" also includes the amount of the credit that will be given to Orange for the flood control work carried out by Orange which has been determined to be compatible with the Project.

C. The term "preconstruction engineering and design costs" (PED) shall mean all continuing expenditures for planning, engineering, and design incurred after 1 October 1985 towards completion of the Phase II GDM, the plans and specifications for the first phases of the project, and any feature design memoranda necessary to produce those plans and specifications.

D. The term "Santa Ana River Mainstem Project" shall include the construction described in Subparagraph A. of this Article and also the construction of the San Timoteo project, which was authorized by the Energy and Water Development Appropriations Act of 1988, P.L. 100-202, as part of the Santa Ana River Mainstem project, including Santiago Creek project and, for purposes of economic justification, the benefits and costs of the San Timoteo Creek project shall be included together with the benefits and costs of the entire Santa Ana Mainstem, including Santiago Creek. The San Timoteo Creek project, if implemented, will be the subject of a supplement to this agreement between the Government and San Bernardino, sponsor for San Timoteo Creek.

E. The term "period of construction" shall mean the time from the advertisement of the first construction contract to the time of acceptance of the Project by the Contracting Officer.

F. The term "Contracting Officer" shall mean the Commander of the U.S. Army Engineer District, Los Angeles, or his designee.

G. The term "highway" shall mean any highway, thoroughfare, roadway, street, or other public or private road or way.

H. The term "relocations" shall mean alterations, modifications, lowering or raising in place, and/or new

3

Exhibit 1    1-3

construction related to, but not limited to, existing: railroads, highways, bridges other than railroad bridges and approaches thereto, buildings, commercial and gas pipelines, public utilities (such as municipal water and sanitary sewer lines, and telephone lines), storm drainage facilities, recreation trails, cemeteries, and other facilities, structures, and improvements determined by the Government to be necessary for the construction, operation and maintenance of the project.  The term "relocations" does not include construction and alteration of railroad bridges and approaches thereto (including temporary detours for use while the new bridges are being constructed), and alterations to foundations and abutments for bridges that are to remain in place.  Said costs shall be considered part of the total project costs and are not included in determining relocation costs borne by the Sponsors.

I.  The term "betterments" shall mean any work beyond that necessary to provide a substitute structure or usage to current design standards of the State of California or the agency having jurisdiction.

J.  The term "features" shall mean each of the following portions of the Project including mitigation therefore: Seven Oaks Dam and Basin;  Mill Creek Levee; regulation of the flood plain between Seven Oaks Dam and Prado Basin; Prado Dam and Basin; Oak Street Drain; Santa Ana Canyon between Prado Dam and Weir Canyon Road; Santa Ana River Channel from Weir Canyon Road to the Pacific Ocean; Santiago Creek including channel work and detention basin and regulation of the floodplain between the channel work and the detention basin; and enhancement lands at the mouth of the Santa Ana River.

K.  The term "phase" shall mean all or a portion of a feature, which is under a construction contract.

L.  The term "enhancement" shall mean those activities to enhance fish and wildlife resources, including acquisition of lands or interests in lands, from which national economic fish and wildlife benefits are derived, or for species that have been listed as threatened or endangered under the Endangered Species Act, 16 U.S.C. Sections 1531 et. seq.

M.  The term "fish and wildlife mitigation" (hereinafter referred to as "mitigation") shall refer to those activities, including acquisition of lands or interests in lands, to compensate for project impacts to fish and wildlife resources.

N.  The term "involuntary acquisitions" shall mean acquisition of lands, easements, and rights-of-way by condemnation proceedings.

O.  The term "Government Fiscal Year" shall mean one fiscal year of the United States Government.  The Government fiscal year begins on October 1 and ends on September 30.

4

Exhibit 1                                                          1-4

P.  The term "Sponsors' Fiscal Year" shall mean one fiscal year of the Sponsors.  The Sponsors' fiscal year begins on 1 July and ends on 30 June.

ARTICLE II - OBLIGATIONS OF THE PARTIES

A.  The Government, subject to and using funds provided by the Sponsors and funds appropriated by the Congress, shall expeditiously construct the Project (including alterations or relocations of railroad bridges and approaches thereto) applying those procedures usually followed or applied in Federal projects, pursuant to Federal laws, regulations, and policies.  The Sponsors shall be afforded the opportunity to review and comment on all contracts, including relevant plans, specifications and special provisions prior to the issuance of invitations for bids.  The Sponsors also shall be afforded the opportunity to review and comment on all modifications and change orders prior to the issuance to the Contractor of a Notice to Proceed for such modification or change order unless an emergency exists or immediate action is required, in which case the Government will direct the change without review by the Sponsors.  The Government will consider the views of the Sponsors, but award of the contracts including change orders and performance of the work thereunder shall be exclusively within the control of the Government.

B.  When the Government determines that a feature or phase of the Project is complete and appropriate for operation and maintenance by a Sponsor or Sponsors, the Government shall turn the completed feature or phase over to the responsible Sponsor or Sponsors, who shall accept the feature or phase of the Project and all responsibility for operating, repairing, maintaining, replacing, and rehabilitating the feature or phase in accordance with Article VIII hereof.  The Sponsors shall share the cost for operation, maintenance, replacement, and rehabilitation of the features and phases of the Project in accordance with the following subparagraphs:

1.  Orange shall provide 100 percent of the costs of operation, maintenance, replacement and rehabilitation of Santiago Creek, Santa Ana River Channel, and Santa Ana Canyon within Orange County, and 87.70 percent of the cost of Seven Oaks Dam and Basin.  Orange shall be responsible on an annual basis (Government Fiscal Year) for 24.8 percent of the costs for operation, maintenance, replacement, and rehabilitation of Prado Dam and Basin.  The Government shall be responsible on an annual basis for 75.2 percent of the costs for operation, maintenance, replacement, and rehabilitation of Prado Dam and Basin.

2.  Riverside shall provide 100 percent of the costs of operation, maintenance, replacement, and rehabilitation of Oak Street Drain and the portion of the Santa Ana Canyon within Riverside County and 5.27 percent of the cost of the operation, maintenance, and rehabilitation of Seven Oaks Dam and Basin.

5

Exhibit 1                                                                    1-5

3.  San Bernardino shall provide 100 percent of the costs of operation, maintenance, replacement, and rehabilitation of Mill Creek Levee and the portion of the Santa Ana Canyon within San Bernardino County and 7.03 percent of the cost of operation, maintenance, and rehabilitation of Seven Oaks Dam and Basin.

C.  Pursuant to Section 103(a)(1) of the Act, 33 U.S.C. 2213(a)(1) and in accordance with Article III of this agreement the sponsors shall provide all lands, easements, rights-of-way, excavated material disposal areas, and perform relocations (excluding railroad bridges and approaches thereto) required for construction of the project as determined by the Government, except that acquisition and restoration of enhancement lands shall be the sole responsibility of the Government.  In the event any such lands, easements, or rights-of-way required for the Project (e.g. haul roads, borrow sites, or disposal areas) are common to more than one feature, acquisition of said lands, easements, and rights-of-way will be performed by the Sponsors in the counties in which they are situated, unless otherwise agreed to among the Sponsors.  The Sponsors shall share costs for lands, easements, rights-of-way and disposal areas and relocations, as specified in the following subparagraphs:

1.  Orange shall provide 100 percent of such costs for Santiago Creek, Santa Ana River Channel within Orange County, Santa Ana Canyon below Prado Dam within Orange County, the Prado Features, and mitigation lands located in Orange County and at Prado basin; and 87.70 percent of such costs of Seven Oaks Dam and Basin, and its associated mitigation.

2.  Riverside shall provide 100 percent of such costs for the Oak Street Drain, and the Santa Ana Canyon below Prado Dam within Riverside County; and 5.27 percent of such costs of Seven Oaks Dam and its associated mitigation.

3.  San Bernardino shall provide 100 percent of such costs of the Mill Creek levee and the Santa Ana Canyon below Prado Dam in San Bernardino County and 7.03 percent of such costs of Seven Oaks Dam and basin and its associated mitigation.

4.  The acquisition costs for lands, easements, or rights-of-way common to more than one feature shall be shared by the sponsors in proportion to the use of said lands, easements, or rights-of-way for each feature.

D.  Pursuant to Section 103(a)(1)(A) of the Act, 33 U.S.C. 2213(a)(1)(A) and as further specified in Article IV hereof, the Sponsors shall provide, during the period of construction, a cash contribution of 5 percent of the total project costs. The Sponsors shall share the required cash contribution based on the features being acquired or constructed, as specified in the following subparagraphs.

6

Exhibit 1                                    1-6

    1.   Orange shall provide 100 percent of such contribution for Santiago Creek, Santa Ana River Channel, Santa Ana River Canyon below Prado Dam within Orange County, and Prado Dam and Basin; 87.70 percent of such contribution for Seven Oaks Dam and Basin; and 94.95 percent of such contribution for PED costs incurred after 1 October 1985.

    2.   Riverside shall provide 100 percent of such contribution for the Oak Street Drain, and Santa Ana Canyon below Prado Dam within Riverside County; 5.27 percent of such contribution for Seven Oaks Dam and Basin; and 3.61 percent of such contribution for PED costs incurred after 1 October 1985.

    3.   San Bernardino shall provide 100 percent of such contribution for Mill Creek Levee, and Santa Ana Canyon below Prado Dam within San Bernardino County; 7.03 percent of such contribution for Seven Oaks Dam and Basin; and 1.44 percent of such contribution for PED costs incurred after 1 October 1985.

    E.   The Government shall afford credit for external compatible work performed by Orange toward Orange's project contributions in accordance with Section 104 of the Act.  Such credit shall not exceed $3,315,000.  The credit shall be afforded against Orange's cost sharing requirements for the Project, less Orange's share of the five percent cash contribution required under Article II.D. of this Agreement.  Orange's cost sharing requirements are presently estimated to be $408,800,000.  Orange's share of the five percent cash contribution is presently estimated to be $57,800,000.  Accordingly, Orange's cost sharing requirements against which credit can be applied are currently estimated to be $351,000,000.

    F.   If the value of the contributions provided under paragraph D. of this Article when added to the value of any items provided pursuant to paragraph C. of this Article is less than twenty-five (25) percent of total project costs, the Sponsors shall provide, during the period of construction, an additional cash contribution in the amount necessary to make the Sponsors' total contribution equal to twenty-five (25) percent of total project costs.  The Sponsors shall share such costs based on the features being acquired or constructed, as specified in Article II.D.

    G.   The amount of Orange's contribution required herein may be reduced by the amount of credit Orange receives for the work it performed pursuant to the Section 215 Agreement dated 2 October 1989. However any credit allowed will not reduce the 5 percent cash contribution required in paragraph D. of this Article.

    H.   The Sponsor shall inform affected interests of the limitations of the protection afforded by the project.  Each of the Sponsors shall provide said notice to affected interests within its county by announcement in a local newspaper of general circulation upon completion of each feature of the project, but no less than once each year.  In the event that the level of protection is also dependent upon completion of another project feature, the Government

Exhibit 1

shall inform the Sponsors of the level of protection provided until all such dependent features are completed. Each of the Sponsors shall also publicize floodplain information relevant to the area affected within its county and shall provide this information to zoning and other regulatory agencies for their guidance and leadership in preventing unwise future development in the floodplain and in adopting such regulations as may be necessary to prevent unwise future development and to ensure compatibility with protection levels provided by the project.

    I.   Orange shall operate and maintain, without cost to the Government, the existing Villa Park Dam on Santiago Creek in accordance with regulations prescribed by the Secretary of the Army.

    J.   Riverside shall operate and maintain, without cost to the Government, the existing Oak Street Drain debris basin in accordance with regulations prescribed by the Secretary of the Army.

    K.   The responsibility for administering the operation, maintenance and rehabilitation of the mitigation and enhancement features of the project shall be in accordance with a management plan to be developed by the Government in coordination with the Sponsors. Management of mitigation and enhancement areas may be turned over to resource agencies, organizations or local groups that can demonstrate capability and experience, and meet the approval of the Government, the Sponsors, and resource agencies.

    L.   The Sponsors shall be solely responsible for the costs for operating, maintaining and rehabilitating mitigation lands. With regard to mitigation applicable to the Seven Oaks feature, costs shall be shared by the Sponsors in relation to benefits received by each Sponsor, 87.70 percent by Orange, 5.27 percent by Riverside, and 7.03 percent by San Bernardino. The costs for operation, maintenance, and rehabilitation for mitigation related to the construction at Prado Dam and Basin, and the construction of the channel downstream of Prado shall be paid entirely by Orange.

    M.   The Government shall be responsible for operation and maintenance of the enhancement lands; however, the Sponsors shall be responsible for paying for 25 percent of the costs of such operation and maintenance on an annual basis. Each of the sponsors shall provide a portion of the Sponsors' share equal to the estimated portion of total flood control project benefits received by each of the Sponsors at the end of project construction, namely, 94.95 percent by Orange, 3.61 percent by Riverside, and 1.44 percent by San Bernardino.

    N.   The Sponsors shall manage the post-project floodway and flood plain fringe as designated by the Secretary of the Army from Seven Oaks Dam to Prado Basin and along Santiago Creek from Walnut Avenue to Benton Way for the future 100-year flood in accordance with the Federal Emergency Management Agency (FEMA) regulations and shall participate in and comply with applicable Federal flood plain management and flood insurance programs.

8

Exhibit 1                                                              1-8

O. The Government shall coordinate with the Sponsors and develop and implement a management plan for open space wildlife habitat in the Santa Ana Canyon below Prado Dam. Each Sponsor shall be responsible for the maintenance costs of the habitat located with the sponsor's boundaries. Maintenance of said habitat shall be the responsibility of the Sponsors, in accordance with the plan.

P. No Federal funds may be used to meet the Sponsors' share of project costs under this agreement unless the expenditure of such funds is expressly authorized by statute as verified in writing by the granting agency.

ARTICLE III - LANDS, FACILITIES, AND PUBLIC LAW 91-646 RELOCATION ASSISTANCE

A. The Sponsors shall furnish to the Government all lands, easements, and rights-of-way, including suitable borrow and dredged material disposal areas, as may be determined by the Government to be necessary for the construction, operation, and maintenance of the Project, and shall furnish to the Government evidence supporting the sponsors' legal authority to grant rights-of-entry to such lands. The necessary lands, easements, and rights-of-way may be provided incrementally, but all lands, easements, and rights-of-way determined by the Government to be necessary for work to be performed under a construction contract must be furnished prior to advertisement of the construction contract.

B. Upon notification from the Government, the Sponsors shall accomplish or arrange for accomplishment at no cost to the Government, all relocations determined by the Government to be necessary for construction of the project.

C. The Sponsors shall comply with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91-646, as amended, in acquiring lands, easements, and rights-of-way for construction and subsequent operation and maintenance of the project, and inform all affected persons of applicable benefits, policies, and procedures in connection with said Act.

D. Title or rights to lands acquired or necessary for project purposes which are currently held for the Project by the Sponsors or the United States shall remain in the current holder of such rights or title, except that the Government may accept title and rights to lands at Seven Oaks Dam and Basin and Prado Dam and Basin provided by the Sponsors for the Project

ARTICLE IV - VALUE OF LANDS AND FACILITIES

A. The value of the lands, easements, and rights-of-way to be included in total flood control project costs and credited toward the Sponsors' share of total flood control project costs

9

**Exhibit 1**

1-9

will be determined in accordance with the following procedures:

  1. If the lands, easements, or rights-of-way are owned by the Sponsor(s) prior to the award of the first construction contract, the credit shall be the fair market value of the interest as of the date of the award of that construction contract. The fair market value shall be determined by an appraisal, to be obtained by the Sponsor(s), which has been prepared by a qualified appraiser who is acceptable to both the Sponsor(s) and the Government. The appraisal shall be reviewed and approved by the Government.

  2. If the lands, easements, or rights-of-way are to be acquired by the Sponsor(s) after award of the first construction contract, the credit shall be the fair market value of the interest as of the date of acquisition. The fair market value shall be determined as specified in subparagraph 1. above. If the Sponsors pay an amount in excess of the appraised fair market value, they may be entitled to a credit for the excess if the Sponsor(s) have secured prior written approval from the Government of its negotiated offer to purchase such interests.

  3. Credit for lands, easements, and rights-of-way in the case of involuntary acquisitions which occur within a one-year period preceding the date this Agreement is signed or which occur after the date this Agreement is signed will be based on court awards, or on stipulated settlements which have received prior Government approval.

  4. If the Sponsor(s) acquire more lands, easements, or rights-of-way than are necessary for project purposes, as determined by the Government, then only the value of such portions of the acquisitions as are necessary for project purposes shall be included in total project costs and credited to the Sponsor(s)' share.

  5. For lands, easements, or rights-of-way acquired by the Sponsors within a 5-year period preceding the date this Agreement is signed, or any time after this Agreement is signed, credits provided under paragraph A. of this Article will also include the actual incidental costs of acquiring the interest, e.g., closing and title costs, appraisal costs, survey costs, attorney's fees, plat maps, and mapping costs, as well as the actual amounts expended for any payment of any Public Law 91-646 relocation assistance benefits provided in accordance with the obligations under this Agreement.

  B. The costs of relocations which will be included in total project costs and credited towards the Sponsor(s)' share of total project costs shall be that portion of the actual costs incurred by the Sponsor(s) as set forth below and approved by the Government:

  1. Highways and Highway Bridges: Only that portion of

10

**Exhibit 1**                                                    1-10

the cost as would be necessary to construct substitute bridges and highways to the current design standard that the State of California, or the public agency which has applicable jurisdiction, would be used in constructing a new bridge, or highway under similar conditions of geography and traffic loads.

2.  Utilities and Facilities (Including Railroads): Actual relocation costs, less depreciation, less salvage value, plus the cost of removal, less the cost of betterments.  With respect to betterments, new materials shall not be used in any relocation or alteration if materials of value and usability equal to those in the existing facility are available or can be obtained as salvage from the existing facility or otherwise, unless the provision of new material is more economical.  If despite the availability of used material, new material is used, where the use of such material represents an additional cost, such cost will not be included in total project costs.

3.  The costs of relocations that the Sponsors have accomplished within 5 years preceding the date of this Agreement may be included in total project costs and credited towards the Sponsors share as such relocations are determined by the Government to be necessary for project purposes.

ARTICLE V - CONSTRUCTION PHASING AND MANAGEMENT

A.  To provide for consistent and effective communication between the Sponsors and the Government during the period of construction, each of the Sponsors, and the Government shall appoint representatives to coordinate on scheduling, plans, specifications, modifications, contract costs, and other matters relating to construction of the project.

B.  The representatives appointed shall meet as necessary during the period of construction and shall make such recommendations as they deem warranted to the Contracting Officer.

C.  The Contracting Officer shall consider the recommendations of the representatives in all matters relating to the Project, but the Contracting Officer, having ultimate responsibility for construction of the Project, has complete discretion to accept, reject, or modify the recommendations.

ARTICLE VI - METHOD OF PAYMENT

A.  The Sponsors shall provide, over the period of construction, the amounts required under Article II.D. and II.F. of this Agreement.  Total project costs are presently estimated to be $1,293,000,000.  In order to meet their share, the Sponsors must provide a cash contribution presently estimated to be $63,700,000. The dollar amounts set forth in this Article are based upon the

11

Exhibit 1                                                    1-11

Government's best estimates which will reflect projections of costs, price level changes, and anticipated inflation. Such estimates are subject to adjustments based on the costs actually incurred and are not to be construed as the total financial responsibilities of the Government and the Sponsors.

B.    The Sponsors shall provide their required cash contribution in proportion to the rate of Government expenditures over the period of the construction in accordance with the following provisions:

1.    For purposes of budget planning, the Government shall notify each of the Sponsors of the estimated funds that will be required from the Sponsors to meet each Sponsor's shares of project costs for the upcoming Government fiscal year following submittal of the President's Budget to the Congress.

2.    For the first Government fiscal year of construction, at least 90 days prior to the award of the first construction contract, the Government shall notify each of the Sponsors of its estimated share of project costs, including each Sponsor's share of costs attributable to the project incurred prior to the initiation of construction. Forty-five days thereafter, each of the Sponsors shall provide its share of the local contribution by verifying to the satisfaction of the Government that it has deposited the requisite amount in an escrow account acceptable to the Government, with interest accruing to the Sponsor(s).

3.    For the second and subsequent Government fiscal years of project construction, the Government shall notify each of the Sponsors of its estimated share of project costs for that fiscal year following submittal of the President's Budget to the Congress. No later than 30 days prior to the beginning of that fiscal year, each of the Sponsors shall make the necessary funds available to the Government through the funding mechanism specified in Article VI.B.2. of this agreement.

4.    As Project proceeds, the Government shall adjust the amounts required to be provided from each of the Sponsors to reflect actual project costs. If the Government determines that additional funds will be needed from the Sponsors to meet their required share of project costs, the Government shall so notify the Sponsors, and the Sponsors, within sixty (60) days from receipt of notice, shall make the necessary funds available through the funding mechanism specified in Article VI.B.2. of this Agreement.

C.    Each month, the Government will draw on the funds in the escrow accounts provided by the Sponsors such sums as the Government deems necessary to cover anticipated contractual and in-house fiscal obligations attributable to the project in advance of their being incurred, except that the Government will withdraw an amount equal to the Sponsors' share of total project costs incurred by the Government prior to the initiation of construction of the Project at the time of the first withdrawal from the escrow accounts.

Exhibit 1                                                        1-12

D.   Upon completion of the Project and resolution of all relevant contract claims and appeals, the Government shall compute the total project costs and tender to the Sponsors a final accounting of the Sponsors share of total project costs.  In the event the total contribution by the Sponsors is less than their minimum required share of total project costs, the Sponsors shall, no later than 90 calendar days after receipt of written notice, make a cash payment to the Government of whatever sum is required to meet their minimum required share of total project costs.

E.   In the event the Sponsors have made cash contributions in excess of 5 percent of total project costs which result in the sponsors having provided more than their required share of total project costs, the Government shall, no later than 90 calendar days after the final accounting is complete, subject to the availability of appropriations for that purpose, return said excess to the Sponsors; however, the Sponsors shall not be entitled to any refund of the 5 percent cash contribution required pursuant to Article II.D. of this Agreement.

F.   If the Sponsors' total contribution under this Agreement (including lands, easements, rights-of-way, utility and facility alterations or relocations, and dredged material disposal areas provided by the Sponsors) exceeds 50 percent of total project costs, the Government shall, subject to the availability of appropriations for that purpose, refund the excess to the Sponsors no later than 90 calendar days after the final accounting is complete.

ARTICLE VII - DISPUTES

A.   Disputes among the Sponsors:  Disputes between two or more of the Sponsors in respect to this Agreement, or to any breach thereof, shall be resolved by the methods hereinafter set forth. For the purposes of the following subparagraphs, a dispute is defined to mean a determination by the District Engineer, Los Angeles District, United States Army Corps of Engineers, that the Sponsors have failed to timely agree on action required by the Sponsors under this Agreement or with respect to this Agreement.

1.   When the District Engineer determines that a dispute exists between two or more Sponsors, the flood control engineer for every Sponsor to this Agreement shall meet and confer to resolve the dispute within a period of 20 calendar days of written notice of the existence of the dispute by the Government.  A unanimous decision of the flood control engineers within this 20-day period shall resolve the dispute and be binding on every Sponsor.

2.   Should the flood control engineers fail to reach a unanimous decision within this 20-day period, the flood control engineers shall present the dispute within the next 10 calendar days to the Chairmen of the Boards of Supervisors for every Sponsor

13

Exhibit 1                                              1-13

or to their designees, who also shall be members of the Boards of Supervisors. The Chairmen of the Boards of Supervisors or their designees shall meet and confer to resolve the dispute within a period of 20 calendar days of presentation of the dispute. A unanimous decision of the Chairmen of the Boards of Supervisors or their designees within this 20-day period shall resolve the dispute and be binding on every Sponsor.

3. If a dispute is not resolved pursuant to these procedures within the 20-calendar day time frames set forth above, the Sponsors shall refer the dispute within the next 5 calendar days to Judicial Arbitration and Mediation Services, Inc., or to another arbitration service mutually agreeable to the Sponsors. All parties agree that time is of the essence in resolving disputes relating to this Agreement and that the Sponsors shall expedite the presentation of disputes for arbitration. The Sponsors shall present the dispute to Judicial Arbitration and Mediation Services, Inc., or the mutually agreed on arbitration service, within 15 calendar days of referral of the dispute for resolution. Judicial Arbitration and Mediation Services, Inc., or the mutually agreed on arbitration service, shall decide the dispute within 15 calendar days after presentation. The Government may, in its sole discretion, bypass the procedures set forth in subparagraphs 1. and 2. above and, upon written notice, require that the Sponsors present any dispute directly for arbitration in order to arrive at an expedited decision. In such event, the referral, presentation, and resolution of the dispute will be conducted within the time frames set forth in this subparagraph.

4. The Sponsors agree that they shall accept any arbitrator assigned by the arbitration service to resolve the dispute. The Sponsors further agree that they will be bound by any award made by the arbitration service and that any award made shall conclusively resolve the dispute. All costs incurred in presenting a dispute, including the costs of any arbitration service, shall be divided equally among the Sponsors unless some other division of costs is made as part of the arbitrator's award. In no event, shall the Government bear any of the costs of presenting and resolving a dispute.

5. The arbitration conducted pursuant to the subparagraphs above shall in all respects be conducted in accordance with California Code of Civil Procedure, Section 1280, et seq., unless otherwise provided herein. The Sponsors agree that the Government may at its discretion enforce any award made pursuant to these subparagraphs in any Federal Court having jurisdiction over this Agreement.

B. Disputes between the Government and the Sponsors: Before any party to this Agreement may bring suit in any court concerning an issue relating to this Agreement, such party must first seek in good faith to resolve the issue through negotiation or other forms of nonbinding alternative dispute resolution mutually acceptable to the parties.

14

**Exhibit 1**                                                                 **1-14**

ARTICLE VIII - OPERATION, MAINTENANCE, REPLACEMENT, AND REHABILITATION

A.  After the Government has turned a completed feature or phase over to the responsible Sponsor or Sponsors, the Sponsor(s) in whose county the feature or phase is located shall be responsible for its operation, maintenance, replacement, and rehabilitation of that feature or phase, except that Orange shall also be responsible for the operation, maintenance, replacement, and rehabilitation of Prado Dam and Basin.  All such operation, maintenance, replacement, and rehabilitation shall be in accordance with regulations or directions prescribed by the Government.  During the life of the Project, the Sponsors may make recommendations to the Government concerning the operation, maintenance, replacement, and rehabilitation of the Project. The Government has complete discretion to accept, reject, or modify the Sponsor's recommendations regarding such operation, maintenance, replacement, and rehabilitation.  The costs of said operation, maintenance, replacement, and rehabilitation shall be shared in accordance with Article II.B. of this Agreement.

B.  The Sponsors hereby give the Government a right to enter, at reasonable times and in a reasonable manner, upon land which the Sponsors own or control for access to the project for the purpose of inspection, and, if necessary, for the purpose of completing, operating, repairing, maintaining, replacing, or rehabilitating the project.  If an inspection shows that any of the Sponsors is, for any reason, are failing to fulfill its obligations under this Agreement without receiving prior written approval from the Government, the Government will send a written notice to each of the Sponsors.  If any of the Sponsors persist in such failure for thirty (30) calendar days after receipt of the notice, then the Government shall have a right to enter, at reasonable times and in a reasonable manner, upon lands the Sponsor or Sponsors own or control for access to the project for the purpose of completing, operating, repairing, maintaining, replacing, or rehabilitating the project.  No completion, operation, repair, maintenance, replacement, or rehabilitation by the Government shall operate to relieve any of the Sponsor of responsibility to meet its obligations as set forth in this Agreement, or to preclude the Government from pursuing any other remedy of law or equity to assure faithful performance pursuant to this Agreement.

ARTICLE IX - RELEASE OF CLAIMS

Orange, Riverside and San Bernardino shall hold and save the Government free from all damages arising from the construction, operation and maintenance of the project except for damages due to the fault or negligence of the Government or its contractors. Orange, Riverside, and San Bernardino shall separately hold and save the Government free from all damages arising from the

15

Exhibit 1                                                                   1-15

construction, operation, and maintenance of the Project features
for which they pay 100% of the construction cost sharing.  For the
remaining project features for which more than one of the Sponsors
is responsible, Orange, Riverside, and San Bernardino shall hold and
save the Government free from all damages arising from the
construction, operation, and maintenance of those features in
proportion to the share of construction costs borne by each of the
Sponsors for that feature in accordance with Article II of this
Agreement.

ARTICLE X - HAZARDOUS SUBSTANCES

A.  After execution of this Agreement and upon direction by the
Contracting Officer, the Local Sponsors shall perform, or cause to
be performed, such environmental investigations as are determined
necessary by the Government to identify the existence of any
hazardous substances regulated under the Comprehensive Environmental
Response, Compensation and Liability Act (CERCLA), 42 USC 9601-9675,
on lands necessary for Project construction, operation, and
maintenance.  All actual costs incurred by the Local Sponsors which
are properly allowable and allocable to performance of any such
environmental investigations shall be included in total project
costs and cost shared as a construction cost in accordance with
Section 103 of Public Law 99-662.

B.  In the event it is discovered through an environmental
investigation or other means that any lands, easements,
rights-of-way, or disposal areas to be acquired or provided for the
Project contain any hazardous substances regulated under CERCLA, the
Local Sponsors shall provide prompt notice to the Government and
shall not proceed with the acquisition of lands, easements,
rights-of-way, or disposal areas until so directed by the
Government.

C.  The Government shall, after consultation with the Local
Sponsors, but in its sole discretion, determine whether to initiate
construction of the Project, or if already in construction, to
continue with construction of the Project, or to terminate
construction of the Project for the convenience of the Government in
any case where hazardous substances regulated under CERCLA are found
to exist on any lands necessary for the Project.  Should the
Government determine to proceed or continue with construction after
considering any liability that may arise under CERCLA, the Local
Sponsors shall be solely responsible for any and all necessary clean
up and response costs, to include the costs of any studies and
investigations necessary to determine the extent of and appropriate
response to the contamination.  Such costs shall not be considered a
part of total project costs as defined in this Agreement.  In the
event the Local Sponsors fail to provide any funds necessary to pay
for clean up and response costs or to otherwise discharge its
responsibilities under this paragraph upon direction by the

16

Exhibit 1                                          1-16

Government, the Government may either terminate or suspend work on the Project or proceed with further work as provided in Article XVII.

D.  The Local Sponsors and the Government shall consult with each other under the Construction Phasing and Management Article of this Agreement to assure that responsible parties bear all necessary cleanup and response costs as defined in CERCLA.  Any decision made pursuant to paragraph c. of this Article shall not relieve any party from any liability that may arise under CERCLA.

E.  The Local Sponsors shall operate, maintain, repair, replace, and rehabilitate the Project in a manner so that liability will not arise under CERCLA.

F.  In the event such liability does arise in the construction, operation, maintenance, repair, replacement, and rehabilitation of the Project, the Local Sponsors shall indemnify the Government for any cleanup costs or response costs for which the Government is found liable under CERCLA.

ARTICLE XI - MAINTENANCE OF RECORDS

The Government and the Sponsors shall keep books, records, documents, and other evidence pertaining to costs and expenses incurred pursuant to this Agreement to the extent and in such detail as will properly reflect total project costs.  The Government and the Sponsors shall maintain such books, records, documents, and other evidence for each project feature for a minimum of three (3) years after completion of construction of the the feature and resolution of all relevant claims arising therefrom, and shall make available at their offices at reasonable times, such books, records, documents, and other evidence for inspection and audit by authorized representatives of the parties to this Agreement.

ARTICLE XII - GOVERNMENT AUDITS

The Government shall conduct audits of the Sponsors' records upon completion of each feature of the Project to ascertain the allowability, reasonableness, and allocability of each of the Sponsors' costs for inclusion as credit against each of the Sponsors' shares of cost pertaining to that feature.  When the Government determines that the Project is complete, the Government shall conduct a final audit, based upon the audits of each feature, to ascertain the final credit for each of the Sponsors against each of the Sponsors' obligations in Article II of this Agreement.

ARTICLE XIII - FEDERAL AND STATE LAWS

In acting under its rights and obligations hereunder, the

Exhibit 1                                                              1-17

Sponsors agree to comply with all applicable Federal and State Laws and Regulations, including Section 601 of Title VI of the Civil Rights Act of 1964, Public Law 88-352, and Department of Defense Direction 5500.11 issued pursuant thereto and published in Part 300 of Title 32, Code of Federal Regulations, as well as Army Regulation 600-7, entitled "Nondiscrimination on the Basis of Handicap in Programs and Activities Assisted or Conducted by the Department of the Army."

## ARTICLE XIV - RELATIONSHIP OF PARTIES

The parties to this Agreement shall act in an independent capacity in the performance of their respective functions under this Agreement, and no party is to be considered the officer, agent, or employee of the other.

## ARTICLE XV - OFFICIALS NOT TO BENEFIT

No member of or delegate to the Congress, or resident commissioner, shall be admitted to any share or part of this Agreement, or to any benefit that may arise therefrom.

## ARTICLE XVI - COVENANT AGAINST CONTINGENT FEES

The Sponsors warrant that no person or selling agency has been employed or retained to solicit or secure this Agreement upon agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Sponsors for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Agreement without liability or, in its discretion, to add to the Agreement or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

## ARTICLE XVII - TERMINATION OR SUSPENSION

A.   If at any time a Sponsor or Sponsors fail to make the payments required under this Agreement, the Secretary of the Army shall, after notice to the Sponsors, terminate or suspend work on the Project until the Sponsor or Sponsors are no longer in arrears, unless the Secretary of the Army determines that continuation of work on the project is in the interest of the United States or is necessary in order to satisfy agreements with any other non-Federal interests in connection with the Project. Any delinquent payment shall be charged interest at a rate, to be determined by the Secretary of the Treasury, equal to one hundred fifty (150) per centum of the average bond equivalent rate of the 13-week treasury bills auctioned immediately prior to the date on which such payment

Exhibit 1                                          1-18

became delinquent, or auctioned immediately prior to the beginning of each additional 3-month period if the period of delinquency exceeds three (3) months.

B.   If the Government fails to receive annual appropriations for the Project in amounts sufficient to meet project expenditures for the then-current or upcoming fiscal year, the Government shall so notify the Sponsors.  After sixty (60) calendar days the Sponsors or the Government may elect without penalty to terminate this Agreement or to defer future performance thereunder; however deferral of future performance under this Agreement shall not affect existing obligations or relieve the parties of liability for any obligation previously incurred.  In the event that either The Sponsors or the Government elect to terminate this Agreement pursuant to this Article, the parties shall conclude their activities relating to the project and proceed to a final accounting in accordance with Article VI.  In the event that either the Sponsors or the Government elect to defer future performance under this Agreement such deferral shall remain in effect until such time as the Government receives sufficient appropriations or until either party elects to terminate this Agreement.

### ARTICLE XVIII - MAXIMUM PROJECT COST

The Sponsors have reviewed the provisions set forth in Section 902 of the Act, and understand the limitations placed on this Project.  For purposes of this Agreement, the Section 902 limit is $1,536,000,000.  This is based on October 1989 price levels and shall be adjusted to allow for appropriate increases in inflation and cost changes  in the Project as provided in Section 902.

### ARTICLE XIX - OBLIGATION OF FUTURE APPROPRIATIONS

Each Sponsor shall use its best efforts to utilize the alternatives set forth in Article XIII.B., et seq. of the California State Constitution (the "Gann Amendment") or to modify its budget, if necessary, in any Sponsors' fiscal year to timely meet its obligations to produce additional funds required by the Government for a fiscal year pursuant to Article VI.B.4. and Article VI.D. of this Agreement.  However, if subsequent to the utilization of such best efforts a Sponsor is precluded by the Gann Amendment to the California State Constitution from timely producing such additional funds, the payment to liquidate any such obligations pursuant to Article VI.B.4. and Article VI.D. of this Agreement may be deferred to the Sponsors' next fiscal year. Any increased project costs occurring as a result of the deferral of such payments, including interest on unpaid amounts which shall be calculated as provided in Section 106 of the Act, shall be borne by the Sponsors alone and shall not be subject to cost sharing by the Government.  It is specifically recognized that the deferral of

19

Exhibit 1                                                    1-19

the payment to liquidate any such obligations pursuant to Article VI.B.4. and Article VI.D. of this Agreement shall not in any way be considered or construed as a suspension of these obligations or conditioning of said obligations in any manner, except as provided herein.

ARTICLE XX - NOTICES

A.  All notices, requests, and other communications required or permitted to be given under this Agreement shall be deemed to have been duly given if in writing and delivered personally, given by prepaid telegraph, or mailed by first- class (postage-prepaid), registered, or certified mail, as follows:

If to the Sponsors:

> Orange County Flood Control District
> 12 Civic Center Plaza
> P.O. Box 4048
> Santa Ana, CA 92702-4048

> Riverside County Flood Control and
> Water Conservation District
> 1995 Market Street
> P.O. Box 1033
> Riverside, CA 92502-1033

> San Bernardino County Flood Control District
> 825 East Third Street
> San Bernardino, CA 92415-0835

If to the Government:

> Los Angeles District
> U.S. Army, Corps of Engineers
> 300 N. Los Angeles
> P.O. Box 2711
> Los Angeles, CA 90053-2325

B.  A party may change the address to which such communications are to be directed by giving written notice to the others in the manner provided in this section.

C.  Any notice, request, demand, or other communication made pursuant to this Article shall be deemed to have been received by the addressee at such time as it is personally delivered or on the third business day after it is mailed, as the case may be.

ARTICLE XXI - CONFIDENTIALITY

To the extent permitted by the laws governing each of the parties, the parties agree to maintain the confidentiality of

Exhibit 1                                    1-20

exchanged information when requested to do so by the providing party.

ARTICLE XXII - ENTIRE AGREEMENT

This Agreement is intended by the parties hereto as a final expression of their understanding with respect to the subject matter hereof and as a complete and exclusive statement of the provisions thereof and supersedes any and all prior and contemporaneous agreements and understandings, oral or written, in connection therewith.  This Agreement may be changed or modified only upon the written consent of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

Exhibit 1                1-21

RIVERSIDE COUNTY FLOOD CONTROL AND
WATER CONSERVATION DISTRICT

Date:                    By: _____
                              Chairman of the Board of Supervisors

    DECEMBER 19, 1989    Attest: _____
                              Gerald A. Maloney, Clerk of the Board

Date:                    By: _____
                              Deputy


                         Seal


Date:                    APPROVED AS TO LEGAL FORM
                         By: _____
                              County Counsel, Riverside County


22

Exhibit 1                                        1-22

SAN BERNARDINO COUNTY
FLOOD CONTROL DISTRICT                    89-1087 (Revised)

Date:    DEC 18 1989         By: _____
                                 Chairman of the Board of Supervisors


ATTEST:

Date:    DEC 18 1989         By: _____
                             Deputy Clerk of the Board of Supervisors
                                   of San Bernardino County, California


APPROVED AS TO LEGAL FORM

Date: 12-14-89               By: _____
                                 County Counsel, San Bernardino County


23

Exhibit 1                                                    1-23

ORANGE COUNTY FLOOD CONTROL DISTRICT

Date:   DEC 14 1989        By: _____
                                Chairman of the Board of Supervisors

SIGNED AND CERTIFIED THAT A COPY OF
THIS AGREEMENT HAS BEEN DELIVERED
TO THE CHAIRMAN OF THE BOARD


Date:   DEC 19 1989        By: _____
                                Linda D. Ruth
                                Clerk of the Board of Supervisors
                                of Orange County, California


APPROVED AS TO LEGAL FORM

Date:   DEC 14 1989        By: _____
                                Benjamin P. de Mayo
                                County Counsel, Orange County


24

Exhibit 1                                            1-24

THE DEPARTMENT OF THE ARMY

Date:  13 DEC 1989          By: _____
                                Robert W. Page
                                Assistant Secretary of the Army
                                (Civil Works)

25

Exhibit 1                                              1-25

## CERTIFICATE OF AUTHORITY

I, _Peter H Lyons_, do hereby certify that I am the County Counsel for the Riverside County Flood Control and Water Conservation District, California, that said Riverside County Flood Control and Water Conservation District is a legally constituted public body with full authority and capability to perform the terms of this Local Cooperation Agreement between the Department of the Army and the Riverside County Flood Control and Water Conservation District, California, in connection with the Santa Ana River Mainstem, including Santiago Creek, California Flood Control Project, and to pay damages, if necessary, in the event of the failure to perform, in accordance with Section 221 of Public Law 91-611, and that the persons who have executed the Agreement on behalf of the Riverside County Flood Control and Water Conservation District have acted within their statutory authority.

IN WITNESS WHEREOF, I have made and executed this Certificate this _7th_ day of _December_, 1989.

_Peter H Lyons_
County Counsel

26

Exhibit 1                                        1-26

CERTIFICATE OF AUTHORITY

I, _____, do hereby certify that I am the County Counsel for the San Bernardino County Flood Control District, California, that said San Bernardino County Flood Control District is a legally constituted public body with full authority and capability to perform the terms of this Local Cooperation Agreement between the Department of the Army and the San Bernardino County Flood Control District, California, in connection with the Santa Ana River Mainstem, including Santiago Creek, California Flood Control Project, and to pay damages, if necessary, in the event of the failure to perform, in accordance with Section 221 of Public Law 91-611, and that the persons who have executed the Agreement on behalf of the San Bernardino County Flood Control District have acted within their statutory authority.

IN WITNESS WHEREOF, I have made and executed this Certificate this 14 day of December, 1989.

_____
County Counsel

27

Exhibit 1                                              1-27

CERTIFICATE OF AUTHORITY

I, _Benjamin P. deMayo_, do hereby certify that I am
the County Counsel for the Orange County Flood Control District,
California, that said Orange County Flood Control District is a
legally constituted public body with full authority and capability
to perform the terms of this Local Cooperation Agreement between
the Department of the Army and the Orange County Flood Control
District, California, in connection with the Santa Ana River
Mainstem, including Santiago Creek, California Flood Control
Project, and to pay damages, if necessary, in the event of the
failure to perform, in accordance with Section 221 of Public Law
91-611, and that the persons who have executed the Agreement on
behalf of the Orange County Flood Control District have acted
within their statutory authority.

IN WITNESS WHEREOF, I have made and executed this Certificate
this _____ day of _December_, 1989.

_____
County Counsel

28

Exhibit 1                                          1-28